*Decision will be entered under Rule 50.*

LEO PROPPER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

BERNARD KAHN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

SAMUEL KAHN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 57672, 57673, 57806. Promulgated October 23, 1935.

*John E. Hughes, Esq., Norman P. S. Schloss, Esq.,* and *Charles Kurz, C. P. A.,* for the petitioners.

*Ralph E. Smith, Esq.,* for the respondent.

262

**OPINION.**

MORRIS: There is no dispute over the cost basis to be used in the determination of gain or loss to these petitioners growing out of the transaction set forth hereinabove. Nor is there any dispute respecting inclusion of the cash, bonds, and real estate in such determination. Hence, the only question for our determination is whether or not the shares of the Delaware corporation, some under a 5-year restriction and some under a 90-day restriction upon sale, to the extent of their value as we find it from the record, should be included in the determination of gain or loss under section 112(c) of the Revenue Act of 1928, which both parties agree is controlling, differing only in the interpretation of the terms thereof.

SEC. 112. (a) *General rule.*—Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 111, shall be recognized, except as hereinafter provided in this section.

(b) *Exchanges solely in kind.*—

\* \* \* \* \* \* \*

(3) STOCK FOR STOCK ON REORGANIZATION.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

\* \* \* \* \* \* \*

(c) *Gain from exchanges not solely in kind.*—

(1) If an exchange would be within the provisions of subsection (b) (1), (2), (3), or (5) of this section if it were not for the fact that the property received in exchange consists not only of property permitted by such paragraph to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

   \*      \*      \*      \*      \*      \*      \*

The parties are in agreement that the transaction in dispute falls within the exception to the general rule laid down in section 112, *supra*, but " What the petitioners challenge is the method of computation." The petitioners argue that the " Respondent computes the gain by deducting the cost or other basis of the old stock from the total proceeds, including in the proceeds the new stock in the reorganized company. Then respondent applies the limitation referred to, in determining the taxable gain. Petitioners, on the other hand, contend that if the gain is to be effectively limited to the proceeds, other than the new stock, the stock must be excluded from the computation altogether, such exclusion being necessarily implied by the limitation, and by the statutory policy of permitting stock in reorganizations to be received without the recognition of gain."

Under the general rule of section 112, gain or loss is recognized upon every sale or exchange. Certain exceptions to that rule are set forth and, under (b) (3), if the exchange of stock is " solely " for stock, no gain or loss shall be recognized. The statutory exception is modified where the exchange is not restricted to the exchange of stock for stock but involves money and other property, and in subdivision (c) of section 112 we find provision for the recognition of the gain, but in an amount not in excess of the sum of the money and the fair market value of the other property. The gain in such a transaction is necessarily the difference between the cost or other basis of the old stock and the fair market value of all the proceeds received in exchange therefor. The value of the new stock is used merely as a means of comparison under the statute, that is, to determine by such comparison what the actual profit is in order to then determine whether such profit is more or less than the limitation placed upon the amount of profit to be taxed. The interpretation contended for by the petitioner would render the limitation meaningless, for, if the fair market value of the new stock does not enter into the computation, the gain could not possibly exceed the sum of the cash and the fair market value of the other property.

The petitioners argue that, in any event, the 46,400 shares should be excluded from the determination, since because of the 5-year restriction placed upon their sale they had no fair market value,

or if they had any fair market value such was not more than $100,000.

The respondent has determined a value of $21 a share and his determination is prima facie correct until overcome by preponderating evidence. To sustain the burden of proof the petitioners have relied upon expert testimony, from which we may, if satisfied with the conclusions drawn, find that (1) the stock had no fair market value whatsoever, or that (2) its fair market value was merely "nominal", varying from $1.50 to $3 a share.

The majority of the witnesses testified that the stock had no fair market value whatsoever and the others more or less reluctantly testified to a nominal value, both groups giving as the principal reason for their conclusions the fact that the stock was restricted. A similar proposal was made in *T. W. Henritze*, 28 B. T. A. 1173, where we rejected the contention that stock containing a restrictive clause was without fair market value, saying:

A contractual obligation assumed by the recipient of shares not to exercise an owner's right of sale does not as a matter of law establish the absence of fair market value. *Newman* v. *Commissioner*, 40 Fed. (2d) 225; rehearing denied, 41 Fed. (2d) 743; certiorari denied, 282 U. S. 858; *Henry S. Parker*, 11 B. T. A. 1336, 1350; *H. H. Champlin*, 28 B. T. A. 264; *Tex-Penn Oil Co.*, 28 B. T. A. 917. The restrictive provisions, although stamped upon the share certificates are not inherent attributes of the shares. Between the corporation and the shareholder exist all of the normal legal incidents of such a relation. The restriction deprives the shareholder of none of his rights *qua* shareholder and adds nothing to either the rights or duties of the corporation. Held, for example, by a trustee prohibited by the trust to sell, they would nevertheless have full market value. Like any other property, such as land, buildings or chattels, they may have substantial fair market value despite a local or temporary obstacle to their cash realization by the one who happens to own them at a given time.

The very purpose of the restriction in this instance is shown by the evidence to be for the protection and enhancement of value rather than its destruction. The hypothesis of fair market value is the existence of willing seller and willing buyer, and it is a manifest anomaly to attempt an ascertainment of what a willing seller would take in respect of property which by reason of a voluntary contractual inhibition he has made himself unwilling to sell. Could it be said, for example, that one who receives as compensation for services a marketable railroad bond, with the agreement with his employer that he will not sell it for a year, has received nothing of fair market value? Cf. *Harry B. Hurd*, 12 B. T. A. 368; *H. L. Carnahan*, 21 B. T. A. 893. Instances of wide diversity come to mind which would make the statute incredibly vulnerable. It has been held in other connections that taxpayers may not, by private contracts or definitions, determine their income tax liability. *Lucas* v. *Earl*, 281 U. S. 111; *Mitchel* v. *Bowers*, 15 Fed. (2d) 287; certiorari denied, 273 U. S. 759; *Phelps* v. *Commissioner*, 54 Fed. (2d) 289; certiorari denied, 285 U. S. 558. And the doctrine is, we think, applicable to a contractual restriction upon the sale or disposition of income received. The petitioners' point, therefore, that because of the restrictive clause upon the shares they were without fair market value, is rejected.

We must, therefore, reject the contention that these shares had no fair market value. See also *Tex-Penn Oil Co.*, 28 B. T. A. 917.

Nor can we, upon the record, sustain the contention that only a nominal value should be assigned. Nearly all of the witnesses were reluctant to attach any fair market value to the restricted shares, notwithstanding the unrestricted shares were selling on the New York Curb Exchange at $33 a share. Their sole reason for assigning only a nominal value was substantially the same reason that they gave for declaring that the shares had no fair market value whatsoever. Three bank officials testified that the stock had no " collateral " value for loan-making purposes. Obviously this testimony is of little assistance in determining the fair market value. Another witness, a " statistician " and " customers' man ", testified that the 46,400 shares, subject to restriction, sold in bulk, all or none, would bring about $100,000 irrespective of what the balance sheet of the company might have shown at that time. In other words, his testimony was influenced by the restriction exclusively upon sale. So that we can give very little credit to this witness' testimony. One witness, a stock broker, testified to a value of from $2 to $3 a share, subject to the restrictions. While admitting that other factors than the restriction placed upon the stock, such as the ability of the officers of the corporation, the state of their health, the stability of the concern itself, and the condition as shown by the balance sheet, should be considered, he admitted that he knew nothing about those factors. His answer, he further admitted, was based purely upon the restriction. Considering all of the testimony of the witnesses, giving full force and effect to their experience and fitness to testify upon the subject matter in controversy, we are of the opinion that the evidence adduced fails to overcome the correctness of the respondent's determination, which we find ourselves impelled to sustain.

The petitioners appear to have abandoned the third issue. At any rate there is no evidence from which we can determine the amount of surplus available for dividends, which is quite necessary if the respondent's determination of that issue is to be answered. Cf. *John S. Woodard*, 30 B. T. A. 1216.

*Judgment will be entered under Rule 50.*